I'm sorry, Your Honor, may it please the Court, Michael Brennan on behalf of Mr. Parker. With the Court's permission, I think it would be more efficient to address the Rule 33 motion first, because That's 055-0254. Because the issue in that case is arguably dispositive of a number of the issues in the Rule 2255 motion, and the issues obviously overlap. That's fine. Unless any of my panel members have a problem with that, we'll handle 055-0234 first. Is that fine with you, Judge Fletcher? We're going to do the second case first, which is the Rule 33 case. I understand that, but perhaps counsel would like to argue the two together. Is that what counsel would like? That's fine, Your Honor. The issues are obviously very related. The 2255 motion, with respect to the issues raised there, my argument would relate to the sentencing issues on appeal, primarily. All right, that's fine. I guess that technically that gives you each 40 minutes each time. So just be mindful of that. So do you want me to, since you have so much time, do you want me to alert you at any point to reserve on rebuttal? I would like to reserve five minutes for rebuttal, Your Honor. Okay, so after 35 minutes? All right. Your Honor, with respect to the Rule 33 motion, at this point in time Did I cut you off, or did you tell me your name? Michael Brennan, right? Okay, thank you. With respect to the Rule 33 motion, the record before the Court at this point in time is no longer sufficient to cause Mr. Parker to have to spend the rest of his life in prison. The problem with the record, and now the expanded record based upon materials that were turned over to Mr. Parker's brother in a related case in which I submitted the court in a supplemental excerpt of record because I only received those materials after I had filed my opening brief on the Rule 33 motion, demonstrate that the testimony of Scott Altman Well, I guess before you get to that, I'm concerned, and this was raised in the briefs, although everyone jumped over it a little bit, but it's a jurisdictional issue on the timeliness pursuant to Federal Rule of Criminal Procedure 33 as amended effective December 1, 1998. Whether this motion for a new trial was even timely, and if it's not timely, then how do we have jurisdiction? Your Honor, the government concedes on page 26 of its answering brief that there's no jurisdictional bar to the appeal. Well, if they're wrong, that jurisdiction isn't something that, you know, we have it or we don't have it. That's the, you know, we don't have to accept concessions if we think they're wrong. Clearly, Your Honor. And I'm sure that you'd like me to think that the government was wrong on a lot of things, but that this might not be one of them. Your Honor, I would submit that the government's response at page 26 in the footnote starting, actually it starts on page 25, footnote 9, to its brief, is correct, and I don't believe there is a jurisdictional bar. So you're saying that the, as modified, the 3-year period versus the 2-year period is just simply not an issue?  Because if, in fact, you look at the Rule 33 as amended, on its face, does it not appear that this motion would be untimely? The verdict's on October 21, 1999, and the motion's filed January 14, 2003. Is it not two and a half months beyond that period of time? It is timely under the prior version of Rule 33. I'm asking under the as amended, on 12-1-98, and the verdict in this case came out 10 months after the modification of Rule 33. How is it that it would not be exceeding the 3-year period from the date of verdict? If that, if the amended rule is applied and that time period is applied by the Court, I would, I have no particular response in terms of that date. Well, either does it apply or does it not apply? I would submit to the Court that the prior version is what the Court should apply in this case. But my question, once again, Counsel, is if the Court were to find that Rule 33 as amended would be the appropriate statutory construction, do you believe that the motions filed when they were would exceed the time period as amended under the rule? As amended, I would agree. All right. Thank you. I would like to, Counsel, this has been spoken of as jurisdictional. I think that it is not jurisdictional. Timing is not a jurisdictional issue. You still could be in trouble because of the rule, but it's not a jurisdictional issue. The government has agreed it's not jurisdictional. Is there any consideration for tolling? Your Honor, the consideration for tolling would be that Mr. Parker was pro se for a substantial period of time. The Court did not appoint Counsel to represent Mr. Parker until after he had filed his 2255 motion and his, then he subsequently filed the Rule 33 motion pro se. And the district court then extended the appointment of Counsel to represent him on the Rule 33 motion. But for an extended period of time after he was convicted and the direct appeal was decided, he was pro se and was litigating this matter while he was in custody. So why don't you proceed to the argument on the merits? With respect to the argument on the merits, the record supporting Mr. Parker's conviction depends in large part, and I would suggest substantially, upon the testimony of the chemist, Mr. Oulton. That testimony tied the only narcotics that were recovered in this case, the 7.5 kilograms of cocaine that were recovered from Codefendant Hensel, to the 295 kilograms that were stolen from the B&E evidence locker. That connection is significant because the only other testimony against Mr. Parker with respect to the conspiracy and the substantive narcotics charge in this case is the testimony of Codefendant Petto. Now, Codefendant Petto's testimony is obviously that of a cooperating codefendant. She received quite a bit of benefit from her cooperation. And if we go back to the first trial, the jury in the first trial obviously had a problem with this case because it acquitted Mr. Parker of two substantive narcotics counts. It hung 10 to 1 for acquittal on all of the other narcotics counts. So this is not a case of overwhelming evidence. Had it been one, the first jury would have had no problem convicting him. They obviously had a substantial problem with this case. Mr. Parker testified in his own defense in the first case. The problem with the record, particularly the now-developed record, is that there is no way, and the government now practically concedes the fact, that there is no way that the narcotics that were turned over to the chemist for analysis could have had those number 17 markings. And it was the number 17 markings that was the basis of the connection by the chemist to the 295 kilos that were stolen from the B&E locker, which is Mr. Parker's connection to the case. If he can't be connected to those 295 kilos, the government can point to a lot of circumstantial evidence that suggests that Mr. Parker was doing something illegal, but it doesn't make their case that they charged him with, which was stealing and then selling 295 kilos of cocaine from the evidence locker. The Klein report, we start with the Klein report. Well, do you agree that in order for your client to prevail, that you must show that Sergeant Klein's November 1998 report was newly discovered evidence? Yes. All right. If so, what do we do with Sergeant Klein's reference to the report in his trial testimony? Well, that's the basis for the fact that it is, in fact, newly discovered evidence. It is evidence that trial counsel did not have. He says on the record, trial counsel says on the record, tell me about these kilograms of cocaine. Klein says, well, I wrote a report about the kilos of cocaine, and if I can look at my report, I can give you that information, I can answer your question. And he says to trial counsel, don't you have it? Trial counsel says, no, I don't have it. Do you have it? And Klein then refers to his copy. It's fairly clear from the record that trial counsel did not have that record. And it's even more suggestive of the fact. You know, counsel. I'm sorry. I have a problem. Certainly he could have demanded it right then, and he knew about its existence. So how can it be newly discovered long after the fact? Well, I obviously was not trial counsel. It might have been a basis for a requirement of new trial right then, but he knew about it. And he's waited all this time. I would suggest to the Court that Sergeant Klein had the document, and he referred to it in answering his questions put to him by trial counsel.  He doesn't realize the significance of the document because had he had a copy of it and had he realized the significance of the document, his whole conduct of the trial from that point forward would have been substantially different. He would have cross-examined Chemist Olton in detail about how do you get 12 kilos of cocaine with number 17 markings on them. Well, but even assuming that this happens all the time in trials. I mean, anyone that's been a trial judge, which you're looking at two right here, that, you know, people always claim they don't have something. And then they ask for it, you take a recess, they look at it, then they come back and everyone, you know, cries to the Court about what are we going to do about this, and you come up with something so that people can be prepared, whether you give them a continuance for a while or you take a recess or any number of things or someone makes a motion for a mistrial. And like Judge Fletcher said, you can't just sit on your hands and then a long time later then claim, well, yeah, I know it came up there, but now I'm claiming it's newly discovered. Well, in part that's why the two motions, the 2255 motion and the Rule 33 motion are related. Parker alleges in his 2255 motion that trial counsel was ineffective for his failure to preserve this issue for purposes of appeal in not making the record in terms of his cross-examination of the case agent and co-defendant Bremer. Well, if the district court had held an evidentiary hearing, what evidence would you have presented that Sergeant Klein's report was newly discovered? Your Honor, I think that if at a minimum this Court should remand this Rule 33 motion back to the district court for an evidentiary hearing. But what would you have shown? I mean, when you're asking for, you know, when you're saying it's newly discovered, you've got to have, you know, you've got to have some concept of. I would submit to the Court that an evidentiary hearing, the evidence would be that trial counsel, all trial counsel representing Mr. Parker did not have this document prior to the commencement of the trial, and as a result couldn't prepare what really was his defense based upon the absence of this document. I think that's what the record would show at an evidentiary hearing, and I would suggest to the Court that the alternate relief in this case to granting the Rule 35 is to remand this matter to the district court for an evidentiary hearing so that the record can be completed. But, Kathleen, you don't have to have an evidentiary hearing, for example, in a trial where there's a government presents evidence or testimony pursuant to the Jinx Act. I mean, this is a very common occurrence, and defense counsel will not be aware of particular statements of the witnesses who have testified until after they have testified, and then when those documents are turned over, the court is then required to give a reasonable continuance at that time. But there's no requirement that there be an evidentiary hearing or anything close to this. This may be a very loose analogy, but why would there have to be this evidentiary hearing at that time in order to make this determination at the trial court level? I would suggest to the Court in this case an evidentiary hearing is necessary because there is substantial question concerning the state of the record, both at trial and the subsequent testimony of Chemist Olton. I would suggest to the Court that at this point the government has conceded, not conceded, that's an overstatement, the government has said in response either two things. The Klein report was wrong to begin with, or in the alternative, and therefore the kilograms of cocaine that went to Olton didn't have 17 markings on them. What the government fails to do at that point is to explain to this Court the significance of that qualified admission. If Olton didn't get any kilos with 17s on them, how did he get into court and testify that they were there? The other thing that I think is important is that the district court has evidently misunderstood the issue in the order denying the Rule 33 motion. The Court states that the 17 markings could have been on some of the other unwrapped kilograms. Well, we know now from the supplemental record that none of the kilograms that went to Olton had 17 markings on them. But if we go back to Klein, at best there were four unwrapped kilos that could have gone to Olton. Olton testifies there were 12 wrapped kilograms with 17 markings on them. The Court says, well, the 12 could have been unwrapped. Well, that's impossible. There were never 12 unwrapped kilos. And how do you have 17 markings on unwrapped kilos to begin with? So the District Court, I think, misunderstood the significance of this issue. And as demonstrated in its ruling denying the Rule 33 motion, there could not be 12 unwrapped kilograms with number 17 markings on them. The other thing is we now have in the supplemental excerpt of record, we have a 2005 document which has been disclosed by the Anaheim Police Department with Agent Jester's signature on it. This is the receipt for his, when he gets the 61 kilograms in 1999 to send the chemist to Olton, he signs a document which outlines in detail the nature of the 61 kilos that he's picking up. None of those kilos indicate any type of number 17 markings. And more importantly, there are only, you can argue that there is an indication that four of the kilos were wrapped in yellow tape of some type, a yellow covering. The Klein report originally says there's 126 kilos with yellow wrappings and a number 17 marking. So the yellow could have the 17 on them. But there's only four. Olton comes back to court and testifies he found 12 kilos with number 17 markings. We have a record that is replete with, at best, substantial inconsistencies. And I would suggest to the court that the record before this court is inadequate, insufficient, unreliable to cause Mr. Parker to be serving an unparolable life sentence, four in fact. I would suggest to the court that if the court does not feel that there is sufficient basis to grant the motion at this point, that certainly Mr. Parker should be given the opportunity to expand that record before the district court. The district court, in terms of the issue of whether this is newly discovered or not, says the record is ambiguous. Well, that's hardly a statement by a district court upon which this Court should rely in affirming a life sentence. If the record is ambiguous, I'm sorry. Judge Fletcher, ask the question. In the record is the statement of the prosecutor as to what was turned over. And that was pretty compelling evidence that she had carefully turned this over. So you have that hurdle also when you're talking about newly discovered evidence. Your Honor, we have an unsigned copy of a cover letter from the government. And I'm certainly not disputing that that letter is not part of the record. It is. But what we have discovered subsequently is that there is substantial reason to believe that Scott Bolton's testimony is simply incorrect. That's the best description that it could be given. And at worst, perjured, because he could not have gotten 12 kilograms with a number 17 marking on them, given the state of the record that we have before us. And all the more reason why trial counsel should have to come into court and testify as to whether or not he, along with co-counsel, his wife, and prior counsel, ever saw this Klein report. Because it is the crux of the case. If the Klein report is right and the kilograms that are submitted to Olton did not have a number 17 marking, there is no connection tying Parker to the 295 kilos from the BNE evidence locker. And that's the charge. Now, the government is going to argue that there is lots of circumstantial evidence that would implicate Parker in wrongdoing. Be that as it may, it doesn't implicate him in the 295 kilos that are taken from the BNE locker without Olton's testimony. That is the only connection, save Peto. Peto is hardly anything other than a cooperating co-defendant who points to Parker and says he's the guy. They search. They find no kilograms of cocaine in Parker's possession. They find trace amounts in gym bags. Trace amounts. 295 kilograms are gone, save supposedly 7.5 kilograms taken from a co-defendant, Hensel, which is the basis of the connection through Olton to the locker. Without that connection, without that triangle, Parker is over here with one co-defendant pointing the finger at him, saying he's the source of all of these narcotics. Well, there's a little more because he has a whole bunch of money and he had access to the storage locker and, you know, all the firearms and all of that stuff. There's a little more. He's a BNE agent. He's got to have firearms. And he has a lot of money. I'm not suggesting that there is no basis in the world for people to be suspicious of Mr. Parker. Lots of reasons to be suspicious of Mr. Parker, but is this record that's now before this court sufficient, sufficiently reliable to cause him to spend the rest of his life in jail? I submit that it's not. And what Mr. Parker should be able to do at a minimum is to expand this record before the district court, through an evidentiary hearing, and then present that issue to this court again. Based upon a complete record, the government points to the fact that trial counsel has not come forth in support of Mr. Parker's assertion in the Rule 33 motion and it's really his, you know, somehow Mr. Parker's obligation to get that declaration. Mr. Parker is alleging ineffective assistance of trial counsel in the 2255. The government also concedes that it contacted trial counsel in an effort to get trial counsel to be supportive of the government's position. Trial counsel responded and said, I will only testify if the court orders me to do so. All the more reason for an evidentiary hearing. Let us have trial counsel come in pursuant to a subpoena, have the court order him to testify and have him say whatever he's going to say about his knowledge, his possession of the Klein report prior to trial. Now, obviously, if he supports the government's position, Mr. Parker has a problem. But I would suggest, given how this case proceeded, that he's not going to say that. Had he said that, had he had that document, his conduct of that trial would have been substantially different than it was. Because Olden could never have gotten on the stand and testified to 12 kilograms with number 17 markings, if trial counsel had the Klein report and also had the information relative to the release of the 61 kilograms in 1999 to Jester, and then Jester to Olden for examination. It's interesting also that the DEA-6 that Jester prepares when he submits the kilograms of cocaine to Olden don't total 61 kilograms and don't mention any kilograms with number 17 markings. So Jester's DEA-6 that he prepares, which is the basis of the submission to Olden, is obviously at least incomplete and misleading because it mentions a total of some 13 kilograms that supposedly go to Olden. So we have a number of documents, none of which support the government's contention that the document was turned over and secondly that Olden's testimony at trial was credible. Now, I have no idea whether Olden ended up with 12 kilograms with number 17 markings. If he did, those markings got on those kilograms at some point after they left the Anaheim Police Department because the records in the Klein report and the records of the 1999 release of the remaining kilograms to Jester never mention number 17 markings. And in fact, because of what we know from what happens to the kilograms in the original Klein report, they couldn't have contained those markings. So at some point, we have testimony about 12 kilograms with a number 17 marking, which are crucial to the government, those 12 kilograms absolutely crucial to the government's prosecution of Mr. Parker. And now we have a record which is insufficient to support that testimony. With respect to the 2255 motion, I think all of the issues raised absent or save the sentencing issues, are going to be resolved based upon this Court's resolution of the Rule 33 motion, except for the issue related to the conviction for the tax evasion count. But quite frankly, Mr. Parker's conviction on tax evasion count is not relevant at this point. The only other issues I would like to point out with respect to the 2255 motion is that trial counsel, who then is retained to represent Mr. Parker on appeal, does not argue two significant issues related to sentencing, which cost Mr. Parker the difference between a sentence at the low end of a guideline range of approximately 25 years compared to life. And those two issues have to do with a two-point enhancement for possession of weapons and a four-point enhancement for his role in the offense. Now those issues were raised before the District Court at sentencing, but somehow when trial counsel becomes appellate counsel and files the appellate brief for Mr. Parker on direct appeal, he neglects to raise any issues related to sentencing for a man who has just been sentenced to four concurrent life sentences. And those six levels are incredibly important in terms of the guideline calculation. With respect to the guns, the probation department merely says at the time of his arrest there were guns in his car. The only person that he had any contact with, any direct contact with in terms of this case, was Monica Pitto. Monica Pitto was his former girlfriend, and if the government's case is to be believed, he had an ongoing relationship with her over a period of years, going back to 1992. There is no evidence in the record that those guns were ever part of that relationship. Why would he have to have guns present to deal with his former girlfriend, Monica Pitto, who he supposedly had been selling drugs to for some six years? So that is a meritorious issue that should have been raised on appeal. Secondly, with respect to the role offense, he gets a four-level enhancement for being an organizer, manager of an extensive criminal enterprise and having managerial control over at least one of those people. Well, first of all, there is very little evidence in the record that we can point to that says that this is an organization of five or more people. The evidence is, again, if the government's case is to be believed, that Parker sold to Pitto. Pitto, in turn, sold to a number of other people. There is no evidence that says Parker had any relationship or contact with any of these other people. Pitto, by her own admission, said, these are my customers. I sell to them, and I've been selling to them for years. None of these people come forward and say, oh, yes, I know Mr. Parker. But how can you be a seller without a supplier? And, I mean, I can see all the arguments. You don't have a very good business if you sit home with all of your dope and your guns and your money and don't have anyone out selling it. But this Court has said the fact that you are a seller doesn't make you a manager. And that's what the Court concluded based solely upon a conclusion of the pre-sentence report. I'm not saying that the merits, obviously, of that issue need to be addressed. But counsel was ineffective in failing to raise them. You have a man who is facing, on the one hand, 25 years, on the other hand, life. He ends up with life. You go up on appeal, and you don't say to this Court, by the way, the district court was wrong at sentencing with respect to two substantial issues. I don't believe Mr. Parker has to say that he would necessarily get this Court to agree with him. But he certainly has a meritorious issue. Well, he has to show. But if he's claiming IAC, you have to show prejudice, right? I mean, if the facts are such that you wouldn't have won and this Court would be convinced of that, you can't really show prejudice, right? Right. I'm just saying that I don't believe Mr. Parker has to today convince this Court that this Court would have agreed with him on both of those issues. I'm merely saying that these are substantial issues on appeal that should have been raised. And he's prejudiced by the fact that they weren't raised. I will. I'm going to reserve the rest of your time. All right. Thank you. Good morning, Your Honors. Elizabeth Rhodes on behalf of the United States. I'd like to start first with the facts of the new trial motion and what evidence was or was not newly discovered. As this Court has said, there was certainly the declaration of two trial counsels, two prosecutors, and that's found at ER 61 through 63, indicating that the documents in question were in fact turned over four months prior to trial. Additionally, there is the testimony of Sergeant Klein at GER 174 and 175, where Sergeant Klein talks about this exact report, says he has a copy, and certainly if counsel didn't have it at that time or didn't have it with him at that time, he could have asked to see it or asked for it to be reproduced by the government. But possibly most significantly, and it is brought up in the government's brief but not argued, is the cross-examination of Special Agent Bodner, which is found at GER 563 through 565. And in that, Mr. Hammer, trial counsel, says, can I show you a report so you could view the seizure, so you could further help this jury? Then Mr. Hammer hands him a report and he says, could you please familiarize yourself with the report, Agent Bodner? Agent Bodner looks at it and then says, the report shows that several kilos of cocaine were turned over. It shows a total of 607 kilos, of which 420 were released to the Riverside office of the Department of Justice of Narcotics Enforcement. And there is a notation by the hundred, by the 607 kilos, at 126 in yellow tape with number 17 written on them. If you go back and look at, in fact, the very document in question, which is found at ER 61 and 62, in fact, at the very end of that document, it says 126 in yellow tape with 17 written on them. So Special Agent Bodner, in fact, reads from the very report that was handed to him by trial counsel. Although trial counsel... You're saying that it appears to be the Sergeant Klein report. Yes. In fact, it's a quote from the Sergeant Klein report, and it's handed to him by counsel. So, in fact, there is no newly discovered evidence. Not only did defense counsel have it, he cross-examined one of the government's witnesses with it. Is that the first or second trial? The second trial. All of the second trial. In all honesty, Your Honor, he may have used it at the first trial, but that is not in the record before this Court on this matter. So what we have here is non-newly discovered evidence. And the trial court, in deciding this issue of whether there should be a new trial or not, can take not only the record before it in the government's papers, but its memory of the trial itself, according to Ross, and, in fact, found that there was no newly discovered evidence. In addition, I would like to address some of the points that Mr. Brennan brought up, and I'd like to go over some of the facts, because I think that the chronology of events in this case is somewhat hard to follow and came in through many different witnesses. The government tied defendant to the burglary in several ways. One of those ways, and only one, is the fact that there were 17s on the kilograms that were stolen from the B&E Evidence Vault and 17s on the kilograms of cocaine that were taken from Hensel. So the circle that defense counsel talks about in his papers is complete with the burglary documents and the Hensel kilograms, the burglary photographs and the Hensel kilograms. Because the burglary kilograms were destroyed, the government used the Anaheim kilograms. So what I'd like to do is go back and give you the entire chronology. In 1994, Anaheim made a large seizure of 607 kilograms of cocaine, and they photographed those kilograms of cocaine on site in 1994, far before the burglary and far before the trial. You may look at GER 159 through 61 and also the government's exhibit, which is found at the GER 610 and 611. The 610 and 611 GER site shows a box of kilograms of cocaine, and one clearly is wrapped in yellow tape with a 17 appearing underneath it, which you can see through the yellow tape. Moreover, Sergeant Klein noted in his testimony that after the seizure, but still in 1994, probably in September of 1994, those kilograms went to the Orange County lab for testing. And at that time, the Orange County lab noted that there were 17s on those kilograms. In 1997, specifically, and that testimony is at GER 180 through 181, in March of 1997, there was a release of 420 of those kilograms that were seized in 1994 to B&E. And in July of that year, there was the burglary of the evidence vault. 420 kilograms were released, 295 were stolen, which meant that some kilograms from the original Anaheim seizure were left in the B&E reverse sting locker inside the evidence vault. And so in order to track the burglary, the agents at the B&E evidence facility took pictures of the remaining kilograms. And they took pictures of what we call Gucci kilograms, because they were wrapped in tape that said Gucci, kilograms that were wrapped in tan tape, kilograms that were wrapped in black, and kilograms that were wrapped in yellow. And that is found at, the photos of those are found at GER 608 and 611, and the testimony about it is 147 through 51. The yellow kilogram showed a 17 coming up underneath the yellow wrapping. Then in September of 1997, B&E destroyed the remaining kilograms. So what we were left with was photos from the original seizure showing a 17 under yellow wrapping, photos from the B&E evidence that was left, that wasn't stolen, showing a 17. In 1998, June 30th of 1998, Gerhard Hensel gets arrested. He is in possession of seven and a half kilograms, but seven full kilograms of cocaine. Those kilograms, for the most part, look as if they are wrapped in gray duct tape. And his testimony is that he wrapped them in Saran, Ziploc, gray duct tape for transportation. In April of 1999, prior to the trial, there appears to have been some destruction of Anaheim kilos, although some are retained, and certainly we have the Hensel kilograms. Now, the Hensel kilograms and the Anaheim kilograms are taken down to the Southwest Border Laboratory. The Hensel kilograms have 17s on them. Now, you can't see them from the outside because they've been wrapped in duct tape. And agent or, I'm sorry, Chemist Olten discusses his findings. And agent or Chemist Olten's testimony is basically from GER 223 through 279. But what he finds is, by stipulation, Exhibits 57 through 63 were the Hensel kilograms, Exhibits 64 through 77 were the Anaheim kilograms. And he goes through and compares them. And in not one but three different ways does he match the Anaheim kilograms to the Hensel kilograms. Most importantly, to connect them to the vault, which we know possessed kilograms with 17s written on them, he finds in Exhibit 57 the innermost layers are clear cellophane and clear tape with 17s on them. Now, the 17s we know were already in the evidence vault, and we know that from pictures. It also matches the Anaheim kilograms. For instance, Exhibit 64. Now, Exhibit 64, he testifies at GER 228, first was wrapped in black and then had a 17 underneath it. So there was no way that one could tell that, in fact, it was a 17 prior, because the black wrapper is not see-through as the yellow wrapper was. Moreover, in Exhibit 66, 67, and 68, 68, which is black rubber, and 66 and 67, which are yellow, there are 17s. Council, in his argument, made a point that in the supplemental record that he produced, there were black rubber, tan rubber, and yellow rubber, kilograms from the Anaheim seizure produced. In all, 13 kilograms with those colors on them, six yellow, four tan, and three black. Thomas Dalton found 12-kilogram wrappers with 17s on them. There was no way he could have known, or anyone could have known until they unwrapped everything, that some of the black taped kilograms had 17s on underneath them. But additionally, that is not the only thing that Chemist Dalton based his analysis on. Some of the Gucci Anaheim kilograms were also unwrapped, and underneath the Gucci wrappers were simulated contact wood paper, then a layer of the stuff you pull off of contact paper with the writing on it. The writing said Medellín, Colombia, and had a fax number. And then finally, a clear cellophane wrapper with tan tape around the edges and a cross in the middle. That was found not only on the Anaheim kilograms, which were marked Gucci, but also on a Hensel kilogram, which was Hensel kilogram 59. That's found at GER 241. So Olton's opinion was that they were from the same source, and that was also given to the court and to the jury in this case. Pictorially, the 17s were pictured and are found at GER 646. The Gucci's, or the most inner wrappings of the Gucci's, which show the clear plastic with the tan cross and tan around the outside, the contact paper, which shows the exact same fax number and same words, Medellín, Colombia, and the simulated wood, is found pictorially at GER 45. So in that sense, in addition, the government's theory was the same, that the kilograms which came from the evidence vault matched the kilograms which came from Hensel. And in every regard, they matched. The third way I should say is that some of the Anaheim kilograms were wrapped in just clear plastic, and some of the Hensel kilograms were wrapped in just clear plastic. Moreover, what this report does, which is in question, is say that there were 17s on the original seizure, and we know that the original seizure, at least a portion of it, 420 kilograms of the 607, was what went into the evidence vault. So although counsel argues that you must look at the report as only saying that Gucci's remained, an additional way to look at the report, and certainly one has to consider the report as a whole, is to say there were 17s in the seizure, and the report makes that clear. There were 17s that went to B&E, evidence vault. In fact, in the cross-examination of Agent Bodner, counsel makes the point that 20 percent of the kilos in the original seizure were, in fact, 17s. So the argument at that time, which counsel is now claiming is ineffective, but the thrust of the defense argument was 17s just aren't that rare, and there could be many sources of 17s, and so finding 17s on different kilograms doesn't match up. But the kilograms in the co-conspirator testimony also contained 17s. So we are not limited to just Chemist Olten's testimony and analysis of the wrappers in order to prove that the co-conspirators in this case used or peddled in kilograms with 17s on them. In fact, we have Pito, who was arrested subsequent to giving Parker $47,000 on the rooftop of a building here in Pasadena. We have her testimony that she saw 17s on the wrappers, and that is supported not just by her testimony in court, but after being arrested, she agreed to cooperate and made a call to Christine Whitney. Christine Whitney and Pito arranged to meet. They did meet, and during that meeting, as Whitney was handing Pito one kilogram of cocaine, she said, these aren't bad. They're not the 17s, but they're not bad. So the evidence of 17s being from the vault and to Parker's co-conspirators who were selling 17s is certainly covered not only by Chemist Olten's testimony, but also by the testimony of co-conspirators Pito, by the co-conspirator statements in the case of Whitney, and by Galen Koshy, who also testified that he remembered 17s. So the argument is not just based on Agent Olten's analysis, and furthermore, the report supports the fact that there were 17s on the original seizure when she went to the vault. There also is this claim of false evidence, but the government would say that that was raised for the first time on appeal. The district court did deal with the fact that it wasn't newly discovered and the fact that there was overwhelming evidence, and the court found that there was overwhelming evidence of defendant's guilt. So with that, I would basically just like to conclude by saying the other evidence that the government had against the defendant in this case were drug ledgers, which specifically matched Agent Pito's testimony — I'm sorry, Monica Pito's testimony when she gave him $47,000. There was a 47-OS or outstanding. Moreover, there was drug dealing in 92-93 and also a ledger from that time period. Then there was a cessation of drug dealing, and it started up again in 1996-97. The ledgers matched that. The unexplained wealth in defendant's possession for a man who made $55,000 but had over $600,000. The fact that he had $97,000 in cash in his work vehicle along with guns. So counsel's argument that the gun enhancement was not merited because Pito was the only one he dealt with is misplaced. When one is carrying around basically $100,000 in cash and the testimony is that there is a gun on the seat next to the $47,000 in cash that he has in one envelope, the government need not prove more that he's trying to protect his narcotics proceeds. Furthermore, as to rule under 3B1.1 of the guidelines which were in effect and used to calculate this sentence for this defendant, defendant certainly controlled Pito, and the distribution network of which he was a part was certainly overfined. The government would also note that the pretrial services report came out with a total offense guideline of 46, which the court did not abuse its discretion in noting that it agreed that the total guideline calculation would be 46, which far exceeds the lifetime sentence. So not only defendant would have to win on both the gun and the role adjustment, which would both be evaluated for abuse of discretion in order to change his sentence. If the court has any questions, I know I've been talking for a long time. There don't appear to be other questions. Thank you for your argument, counsel. If the court goes back and examines the testimony of Chemist Olden, the conclusion that the jury would draw from that testimony, I would submit, is that the similarity that he relied upon in saying that the Hensel cocaine came from the B&E locker was the 17 markings. The other similarities were not in and of themselves substantial enough to say that those kilograms had to come from the B&E locker. The wrappings, the wood-type wrappings, Olden doesn't testify that those wrappings were in and of themselves significantly different from thousands of other kilos that he's seen to say that that was the source, the B&E locker. Now, I grant you that there were kilos with the number 17s that went to the B&E locker. That's clear. It's in the Klein report. And those were visible from the outside, because that's why they're listed, yellow kilograms with number 17s on them. Klein and the Anaheim Police Department didn't take those kilos apart to look inside. They said, here are the 17s. We can see them. So there's an identification. They go to the locker. I, again, would submit that this record is simply unreliable at this point in time. And if the Court determines that Mr. Parker has not sufficiently convinced the Court that the Rule 33 motion should be granted at this point in the alternative, I would request that the Court remand for an evidentiary hearing so that a number of these evidentiary questions that we've all discussed for the past hour or so can be resolved, at least, I hope, to this Court's satisfaction before Mr. Parker serves the remainder of his sentence. Thank you. All right. Thank you both, counsel, for your argument on this matter. And your ability to cite to the record was helpful from both your perspectives since these are fairly extensive records. Thank you. At this time, both 04-55736 and 05-50254 will stand submitted. This Court is now in recess until tomorrow morning at 9 o'clock. Thank you.
judges: B. Fletcher, Callahan, England